S09A0933. KEITA v. THE STATE.
(684 SE2d 233)

NAHMIAS, Justice.

Abdoulaye Keita appeals from his convictions for several crimes, including murder, stemming from the shooting death of cab driver Emanuel Abunaw.[1] Keita contends, among other things, that the trial court erred in admitting into evidence the front cover of a funeral pamphlet that included a photograph of the victim. We affirm.

---

[1] The crimes occurred on October 11, 2006. On April 25, 2007, Keita was indicted for malice murder, felony murder, aggravated assault, possession of a firearm during the commission of a crime, and unlawful removal of baggage from the terminal at the Atlanta airport. On October 17, 2007, a jury found Keita guilty on all counts. That same day, the trial court sentenced Keita to life in prison for the malice murder conviction, to five consecutive years for the unlawful removal of baggage conviction, and to five consecutive years for the possession conviction. The felony murder conviction was vacated as a matter of law, *Malcolm v. State*, 263 Ga. 369, 371-372 (434 SE2d 479) (1993), and the trial court merged the aggravated assault conviction with the conviction for malice murder. On October 30, 2007, Keita filed a motion for new trial, and on September 30, 2008, he amended his motion for new trial. On December 2, 2008, the trial court denied Keita's motion for new trial, as amended, and on December 5, Keita filed a notice of appeal. On February 25, 2009, the appeal was docketed in this Court. It was subsequently submitted for decision on the parties' briefs.

1. David Manning testified that, on October 11, 2006, he was flying to Atlanta from Las Vegas. Because of an emergency stop of his plane in Arizona, he was separated from his bag, which proceeded on to Atlanta. Manning added that he never gave Keita permission to pick up his bag. The detective in charge of criminal investigations at the Atlanta airport identified photographs of a person approaching a luggage carousel at the airport at 8:01 a.m. on October 11, 2006. The person was wearing the type of clothing — a baseball cap and dark, loose-fitting jeans and jacket — worn by Keita that day. The detective added that freeze-frame photos taken of the taxi cab runway at the airport showed someone approaching a taxi shortly after 8:00 a.m. on October 11 and that the number on the taxi was "0138" or "three something." The number of the victim's taxi was 0132.

Sylvia Fletcher testified that she was following a cab on her way to work shortly after 8:00 a.m. on October 11, 2006. When she was less than a car length behind, she heard a gunshot from the cab. The taxi driver turned around and, with his hands out in a defensive posture, began struggling with the passenger in the rear seat. A second shot was then fired, and the cab veered off the road and down an embankment. Ms. Fletcher stopped at a nearby gas station and called 911. When she was telling the 911 operator what was happening, she heard a third shot. Shortly thereafter, she saw a person walk up the embankment where the cab went over and begin walking down the sidewalk. At trial, Ms. Fletcher could not remember what type of shirt or jacket the person was wearing but did remember he was wearing black jeans. Ms. Fletcher also testified that she was not sure whether the person who walked up the embankment was the cab driver or the passenger, and she was not asked at trial to identify Keita as the person she saw wearing the black jeans. Although Ms. Fletcher testified that she heard a gunshot before the struggle began, a police officer who interviewed her shortly after the incident testified that, in one of her statements to the police, she stated that she saw a struggle before she heard a gunshot.

A 16-year-old girl who lived with her mother in a house near where the shooting occurred testified that Keita came into her backyard on the morning of October 11, 2006, and asked if he could come into her house. She told him he could not, and he left. According to the girl, Keita was wearing a baseball cap, brown shoes, and all black clothes, including black jeans and a black shirt. About a minute after the girl went back inside her house, she and her mother saw police officers in front of the house. The girl told the officers a man had just been in her backyard, and she informed them what he was wearing and what he looked like.

Police officers spread out across the neighborhood to search for

the suspect. Soon thereafter, a police officer saw Keita walking close to the front porch of a house. At that time, Keita was wearing baggy black jeans, a red and white striped shirt, and brown shoes. He was no longer wearing a jacket or a baseball cap. The officer asked Keita if he lived at the house, and Keita responded that he did not and that he was there to see a friend named Black. Keita added that he lived in the neighborhood and was just leaving. Keita then walked through the front yards of several houses and knocked on the front door of a house. When no one answered, he walked behind the house, and a dog started barking.

The officer walked up to the house, saw Keita come around the side of the house, and asked him if he lived in the area. This time Keita said he did not live in the neighborhood, and that his mother had just dropped him off at the first house a few minutes ago. Keita's shoes and jeans were wet, and his jeans were rolled up to just below the knee. The officer testified that it had not been raining and that there was nothing at the houses from which he could have gotten wet. There was also a ring around Keita's forehead, making it appear he had been wearing a cap of some kind. The officer went back to the first house at which he saw Keita, knocked on the door, and determined that no one named Black lived there. The officer then went back to Keita and detained him. Shortly thereafter, another officer took a photograph of Keita and showed it to the girl, who identified Keita as the man she had seen in her backyard.

The only way to get from where the accident happened to where the officer found Keita was to cross a wet, boggy creek bed. A police K-9 unit was brought to the backyard of the house where the girl had seen Keita. The dog picked up the suspect's scent and led the officers through a "swampy area" around the creek in which they saw a footprint in the mud. The officers crossed the six-foot wide creek and connected with the officers who had detained Keita. One of the officers with the K-9 unit testified that Keita's shoes were wet and muddy. In canvassing the area for evidence, the police recovered a black jacket, a black t-shirt, and a baseball cap in a wooded area behind one of the houses in the neighborhood.

Forensic evidence showed that blood found on the black jeans that Keita was wearing came from the victim. A medical examiner testified that the victim had been shot four times. Two of the gunshots entered the victim's left arm, and one entered the back of his left hand. These three wounds were survivable. Another gunshot, however, struck the victim in the upper left torso, severed a major artery, and caused the victim to bleed to death. David Manning's bag was found in the victim's taxi.

Keita contends the evidence is insufficient to support his conviction for the unlawful removal of baggage from the Atlanta airport,

OCGA § 16-12-124. We conclude that, viewed in the light most favorable to the verdict, the evidence was sufficient for a rational trier of fact to have found Keita guilty beyond a reasonable doubt of that crime and the other crimes of which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Keita contends that there was slight evidence to support a charge on voluntary manslaughter and that the trial court erred in refusing to give his requested charge. We disagree.

A trial court is required to give a requested charge on voluntary manslaughter if there is slight evidence showing that the victim seriously provoked the defendant, causing the defendant to kill the victim "solely as the result of a sudden, violent, and irresistible passion," OCGA § 16-5-2 (a). *Morgan v. State*, 276 Ga. 72, 76-77 (575 SE2d 468) (2003). There was no evidence that the victim, while unarmed and driving his cab, committed an act of serious provocation against Keita, who was in the back seat, so as to prompt Keita to fire four gunshots at the victim. Accordingly, the trial court did not err in refusing to charge on voluntary manslaughter. Id.

3. Keita contends the trial court erred in permitting the State to introduce the cover of a funeral pamphlet into evidence. We conclude the trial court did not abuse its discretion in admitting the cover and that, even if it did, the error was harmless.

The State sought to introduce two funeral pamphlets into evidence. At a hearing on Keita's motion in limine to exclude the pamphlets, the trial court said it would not permit the introduction of the entire pamphlets because they included religious themes and scripture. For this same reason, the court also excluded the introduction of even the cover of one of the pamphlets. The court, however, ruled that the State could introduce the cover of the other pamphlet. That cover contained a photograph of the victim in a suit and tie, the phrase "Home Going Celebration," a cross, the name and address of the funeral home, and the name of the bishop conducting the service. The cover did not contain any information about the victim's membership or role in a church or any other information about the victim. The court reasoned that the State has a right to introduce a photograph of the victim and that the fact the victim had a funeral service was not "particularly prejudicial." The cover was admitted at trial through the victim's widow, who simply referred to it as part of a funeral pamphlet, without mention of any Christian references.

Photographs of a deceased victim are admissible to prove the victim's identity. *Woods v. State*, 265 Ga. 685, 687 (461 SE2d 535) (1995). If the defendant objects that the probative value of a photograph is "outweighed by its tendency to unduly prejudice the jury, [the trial court] must exercise its discretion in determining

admissibility." Id. Here, the cover of the pamphlet contained a non-inflammatory photograph of the victim in a suit and tie, and it contained no personal information about the victim other than the indication that he had a Christian funeral service. As the trial court noted, informing the jury that the victim had a funeral service is not particularly prejudicial; indeed, the victim's wife testified, without objection, that the victim was buried in Cameroon. The minimal Christian references around the photograph also were not unduly prejudicial. Accordingly, while it would have been preferable for the trial court to have admitted the photograph of the victim alone, without extraneous material that was unnecessary to aid in identifying him, we cannot say that the trial court abused its discretion in admitting the document.

The cases on which Keita relies, *Walker v. State*, 282 Ga. 774 (653 SE2d 439) (2007), and *Lucas v. State*, 274 Ga. 640 (555 SE2d 440) (2001), are distinguishable. In *Walker*, the trial court permitted the victim's wife, over objection, to testify in "the guilt/innocence phase about the victim's church membership and his being a deacon." 282 Ga. at 777. We concluded that the wife's testimony violated the proscription against victim-impact evidence, but we also held that, based on our review of the record, the testimony was harmless beyond a reasonable doubt. Id. In *Lucas*, another death penalty case, evidence was introduced in the guilt-innocence phase that one victim was " 'an A-B student' " and made the " 'All-Star team every year' " and that the other victim was voted " 'most likely to succeed by classmates.' " 274 Ga. at 642. We held that this was improper evidence of victim impact but that the error was harmless. Id. at 642-644. *Walker* and *Lucas* thus involved more specific information about the victim's personal life that was "likely to engender the jury's sympathies," *Walker*, 282 Ga. at 777. The minimal information on the cover of the funeral pamphlet here did not rise to that level.

Moreover, even assuming the trial court erred in admitting the cover of the pamphlet, the error was harmless considering the strength of the evidence against Keita and the fact that the cover did not contain material that would engender strong sympathy for the victim or prejudice to Keita. *Walker*, 282 Ga. at 777; *Lucas*, 274 Ga. at 643-644.

4. Keita contends the trial court erred in refusing to give his requested charge that "[i]t matters not how serious an offense is; if the party upon trial is not guilty, then it is your duty to acquit." We find no error. A trial court's refusal to give a jury charge in the exact language requested by a defendant is not error if the charge given by the trial court substantially covers the applicable principles of law. *Petty v. State*, 283 Ga. 268, 271 (658 SE2d 599) (2008); *Walker v.*

*State*, 282 Ga. 406, 408 (651 SE2d 12) (2007). The trial court here charged the jury three times that, if the jury had a reasonable doubt as to Keita's guilt, it was the jury's duty to acquit. These charges substantially covered Keita's requested charge.

*Judgment affirmed. All the Justices concur.*

DECIDED SEPTEMBER 28, 2009.

*David J. Walker*, for appellant.
*Tracy G. Lawson, District Attorney, Thurbert E. Baker, Attorney General, Sheila E. Gallow, Assistant Attorney General*, for appellee.