308 Ga. 450
FINAL COPY

S20A0226.  FRAZIER v. THE STATE.

Nahmias, Presiding Justice.

Appellant Michael Antonio Frazier, Jr., was convicted as a party to the crimes of felony murder and possession of a firearm during the commission of a felony in connection with the shooting death of one of his accomplices, Quenterious Griner. Appellant's sole contention is that the evidence presented at his trial was insufficient to support his convictions. We affirm.[1]

---

[1] Griner was killed on February 7, 2016. On April 21, 2016, a Washington County grand jury indicted Appellant, Mardriquez Harper, Brandon Seals, D'Andrious Brown, Tevyion Brown, Keyontray Johnson, and Tevon Scott. The charges against Appellant were felony murder based on aggravated assault, felony murder based on attempt to commit armed robbery, aggravated assault, attempt to commit armed robbery, and four counts of possession of a firearm during the commission of a felony. Appellant was tried alone from September 10 to 13, 2018, and the jury found him guilty on all counts. The trial court sentenced Appellant to serve life in prison for felony murder based on attempted armed robbery and five consecutive years for one of the firearm offenses. The remaining counts merged or were vacated by operation of law. Appellant filed a timely motion for a new trial, which he later amended with new counsel. The trial court denied the motion on July 24, 2019. Appellant then filed a timely notice of appeal, and the case was docketed to the term of

1. Viewed in the light most favorable to the verdicts, the evidence at trial showed the following. On the afternoon of February 7, 2016, Griner died from a gunshot wound after a shootout between two groups of men at Kaolin Park in Sandersville. Earlier that day, Appellant's associate Mardriquez Harper spoke on the phone with Harper's friend Tykima Lovick. Lovick testified that she told Harper that D'Andrious Brown had asked her to connect him with someone who could sell him some marijuana. Lovick had previously connected Brown with Harper for a drug transaction, and Harper told Lovick to give Brown his phone number, which she did.

Brown then told Lovick that he was planning to rob Harper. Lovick's friend Kenisha Riddle testified that she overheard this conversation because Lovick's phone had the speaker on. Riddle sent a Facebook message to Harper to let him know about Brown's plan. Lovick testified that she then called Harper to tell him not to meet Brown. During the call, Lovick heard Harper say, "I'm on the same

this Court beginning in December 2019 and submitted for a decision on the briefs.

s**t he on," and someone in the background say, "I bagged up all this weed and you telling me they don't want it? Either somebody gone get their money took or somebody gone get shot or killed." Riddle also heard someone in the background — not Harper — say, "We got guns too." Appellant told investigators in an audio-recorded interview after the shooting that at the time of this phone call, he, Griner, and Brandon Seals were with Harper. Appellant acknowledged that a statement about guns was made, but he said that neither Griner nor Seals spoke during the call and claimed that Harper was the only man speaking. Lovick knew Harper and testified that his voice was not the voice she heard in the background; Lovick added that she did not think the voice was Griner's or Seals's either.

During the same interview after the shooting, Appellant said that after the phone call, Harper and his group, which had added a man known as "Hakeem," went to meet Brown at Kaolin Park. Harper had asked the group to accompany him for "safety," and although Appellant did not have a gun, he knew that Harper and

Griner were armed with guns. Harper's group spread out around the small park. Appellant and Harper then approached Brown, who was sitting alone in his car in the parking lot. Hakeem hung back at the woodline of the park. Griner and Seals approached the restroom at the edge of the parking lot. As Seals kicked open the door, gunshots were fired out of the restroom. Brown then got out of his car, and Harper shot at him. Three men, who apparently had come with Brown and were lying in wait in the restroom for Harper and his group, came out and started shooting toward Appellant, Harper, and Hakeem, who ran out of the park together through the woods.

Appellant's cousin Ken Fragher was dropping off a neighbor, Nicholas Johnson, at the park at the time of the shooting. Fragher testified that when Appellant and Harper arrived at the park, they walked up to his car and talked to him and Johnson; Harper appeared to be armed. Griner and Seals also walked into the park from the woodline. Johnson told Appellant and Harper that he saw some men peeking out of the restroom, and then Harper said something to Griner and Seals, who began walking toward the

restroom. When Seals kicked open the restroom door, gunshots rang out.

As Griner ran away from the restroom, he was shot once in the back by a .40-caliber bullet; he died at the scene. At some point during the gunfire, Seals was shot in the arm or shoulder. Investigators later found four .40-caliber shell casings in and around the restroom, one .380-caliber shell casing outside the restroom, and two 9-millimeter shell casings in the parking lot. They also found .22-caliber ammunition, a .22-caliber ammunition box, and a rod from a revolver in the parking lot. The .40-caliber bullet that killed Griner was matched to a gun that Brown gave investigators during an interview.

As Appellant ran away from the park with Harper and Hakeem, they encountered Lieutenant Wanda Peacock, a Sandersville police officer who was responding to a call of shots fired at the park. When Lieutenant Peacock first saw Appellant, he was wearing a backpack. Although Harper kept running, Hakeem stopped to talk to Lieutenant Peacock, while Appellant ran into a

nearby house, then came back out a couple minutes later still wearing the backpack. Lieutenant Peacock stopped Appellant and searched the backpack, but found only a PlayStation gaming console. She then let Appellant go after she received a call that there was a "man down" at the park.

After the shooting, a group of people including Appellant and Harper gathered at Seals's house. Ricardo Burnett, a friend of Seals and Harper, testified that he heard Appellant say, "[Harper] and [Seals] and them was going out there to rob somebody and the guys who was at the park that supposed to have been robbing them about a drug deal . . . ." Appellant also said that Brown's group "wanted some weed or something, and they were gone rob them for money or something" and that "[Seals] walked up and kicked the door and the guys started shooting, and that's when they took off running."

Appellant did not testify at trial, but the jury heard evidence of Appellant's statements to investigators after the shooting. GBI Special Agent Thomas Bell interviewed Appellant twice on the day of the shooting in a non-custodial setting. Agent Bell testified that

Appellant claimed in the first interview that at the time of the shooting, he was at the park playing basketball and had nothing to do with the shooting. In the second interview several hours later, Appellant changed his story and said that he witnessed the shooting and that "they were planning to meet there for a drug transaction"; Appellant also said that he and Harper were "posted on the woodline looking at the car, initially." In another non-custodial interview about two weeks later, the audio recording of which was played for the jury, Appellant admitted that he went to the park with Harper, Griner, and Seals, and he gave the account discussed above.

2.     Appellant's only claim on appeal is that the evidence presented at his trial was legally insufficient to support his convictions. We disagree.

(a) The legal principles applicable to our review of Appellant's claim are well established.

> When we consider the sufficiency of the evidence [as a matter of federal due process], our review is limited to whether the trial evidence, when viewed in the light most favorable to the verdicts, is sufficient to authorize a rational trier of fact to find the defendant guilty beyond a

reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979); *Mims v. State*, 304 Ga. 851, 853 (1) (a) (823 SE2d 325) (2019). "Under this review, we must put aside any questions about conflicting evidence, the credibility of witnesses, or the weight of the evidence, leaving the resolution of such things to the discretion of the trier of fact." *Mims*, 304 Ga. at 853 (1) (a) (citation and punctuation omitted).

*Clark v. State*, 307 Ga. 537, 539 (837 SE2d 265) (2019). In addition, as a matter of Georgia statutory law, "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. Whether alternative hypotheses are reasonable, however, is usually a question for the jury, and this Court will not disturb the jury's finding unless it is insufficient as a matter of law. See *Graves v. State*, 306 Ga. 485, 487 (831 SE2d 747) (2019).

To convict Appellant of felony murder and possession of a firearm during the commission of a felony, the State was not required to prove that he personally fired the shot that killed Griner, only that Appellant was a party to the crimes, meaning that he

intentionally aided or abetted in the commission of the crimes or intentionally advised, encouraged, counseled, or procured someone else to commit the crimes. See OCGA § 16-2-20 (b) (defining parties to a crime); *Bryant v. State*, 296 Ga. 456, 458 (769 SE2d 57) (2015) ("'A person who does not directly commit a crime may be convicted upon proof that the crime was committed and that person was a party to it.'" (citation omitted)). "While mere presence at the scene of a crime is not sufficient evidence to convict one of being a party to a crime, criminal intent may be inferred from presence, companionship, and conduct before, during, and after the offense." *Parks v. State*, 304 Ga. 313, 315-316 (818 SE2d 502) (2018) (citation and punctuation omitted). See also *Broxton v. State*, 306 Ga. 127, 136 (829 SE2d 333) (2019).

Moreover, Appellant could be found guilty of felony murder even if he did not intentionally aid or encourage the shooting of Griner, as long as Appellant was a party to the underlying felony that was a proximate cause of his accomplice's death. See OCGA § 16-5-1 (c); *State v. Jackson*, 287 Ga. 646, 660 (697 SE2d 757) (2010).

"Proximate causation imposes liability for the reasonably foreseeable results of criminal . . . conduct if there is no sufficient, independent, and unforeseen intervening cause." *Jackson*, 287 Ga. at 654. See also *Robinson v. State*, 298 Ga. 455, 457-459 (782 SE2d 657) (2016) (holding that the fatal shooting of the defendant's accomplice by the victim during an attempted armed robbery was foreseeable); *Jackson*, 287 Ga. at 652 (explaining that the defendants "planned an armed robbery of someone they believed to be a drug dealer, who also turned out to be armed, an occurrence not unusual among drug dealers").

(b) Applying these legal principles, the evidence presented at Appellant's trial supported the jury's rational finding, beyond a reasonable doubt, that Appellant was not just an innocent bystander but rather a party both to the attempted armed robbery that foreseeably led to the shootout in which his accomplice Griner was killed, and to the possession of a firearm by an accomplice during the commission of that felony. To begin with, Appellant admitted that he was with Harper, Griner, and Seals before the shooting, and

the jury could have reasonably inferred that Appellant was the person whom Lovick and Riddle overheard in the background of Lovick's phone call with Harper encouraging the armed robbery and stating that Harper's group had guns too.

Appellant also admitted that he accompanied his accomplices, at least two of whom were armed with guns, to the park to confront Brown, knowing that Harper's group and Brown planned to rob each other in the course of a purported drug deal and that Harper wanted his associates there for "safety." At the park, Harper and his associates spread out, with Appellant and Harper "posted" at the woodline before they approached Brown in the parking lot. Appellant's accomplice Seals made the first aggressive move by kicking open the restroom door where Johnson saw men peeking out. And in response to the gunfire from Brown's associates, Harper, with whom Appellant was standing, shot at Brown.

Two of Appellant's accomplices were shot – Griner fatally – while Appellant fled the scene with his other two associates and evaded a responding police officer for a few minutes by running into

a house. After the shooting, Appellant was with Harper again at Seals's house, where Appellant was overheard discussing the shooting in a way that further indicated that he knew a drug-related robbery had been expected to take place at the park. Appellant also initially lied to investigators by denying any involvement in the shooting.

Viewed as a whole, this evidence was sufficient to support Appellant's convictions as a matter of due process and under OCGA § 24-14-6. See, e.g., *Parks*, 304 Ga. at 316; *Muckle v. State*, 302 Ga. 675, 678-679 (808 SE2d 713) (2017); *Robinson*, 298 Ga. at 457-459; *Hill v. State*, 297 Ga. 675, 677-678 (777 SE2d 460) (2015); *Bryant*, 296 Ga. at 458.

*Judgment affirmed. Melton, C. J., and Blackwell, Boggs, Peterson, Warren, Bethel, and Ellington, JJ., concur.*

DECIDED APRIL 6, 2020.
Murder. Washington Superior Court. Before Judge Reeves.
*Randall P. Sharp*, for appellant.
*S. Hayward Altman, District Attorney, Kelly J. Weathers, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Katherine D. Emerson, Assistant Attorney General*, for appellee.