309 Ga. 348
FINAL COPY

S20A0196.  LOFTON v. THE STATE.

BOGGS, Justice.

Appellant Reginald Lofton challenges his 2016 conviction for being a party to felony murder predicated on the armed robbery and shooting death of pizza delivery driver Shane Varnadore. Appellant claims that the trial court made a number of evidentiary errors and that his trial counsel rendered constitutionally ineffective assistance in two respects. We affirm.[1]

---

[1] Varnadore was killed on the night of March 1, 2016. On May 26, 2016, a Gwinnett County grand jury indicted Appellant, who was 14 years old, and 21-year-old Jermaine Young for malice murder, two counts of felony murder, armed robbery, and aggravated assault. Appellant was charged as an adult. At a separate trial from October 31 to November 4, 2016, the jury acquitted Appellant of malice murder but found him guilty of all other charges. In December 2016, the trial court sentenced Appellant to serve life in prison for felony murder and merged the other three guilty verdicts. We do not address the propriety of the trial court's merger rulings because the State elected not to file a cross-appeal. See *Dixon v. State*, 302 Ga. 691, 697-698 (4) & n.3 (808 SE2d 696) (2017). Appellant filed a timely motion for new trial with new counsel, which he amended on December 21, 2017. After an evidentiary hearing, the trial court denied the motion on February 28, 2019. Appellant filed a timely notice of appeal, and the case was docketed in this Court to the term beginning in December 2019 and submitted for decision on the briefs.

1. The evidence presented at trial showed the following.[2] In 2015, Appellant moved from Chicago to the Atlanta area to live with Porsha Porter, his older sister and legal guardian, after Appellant's mother died and his father was deemed unfit to care for him. Appellant and his older brother Malek Buckley lived with Porter and Porter's friend Ciara Harris in apartment 9301 of the Wesley Herrington Apartments in Lawrenceville; Appellant and Buckley shared one of the apartment's two bedrooms, and Porter and Harris shared the other. On March 1, 2016, Buckley's friend Jermaine Young was temporarily staying at the apartment but planned to leave the next day to return home to Chicago; Young slept on the couch in the living room. It was raining that evening, and Porter overheard Appellant offer to buy pizzas for the group.

According to cell phone records and testimony from Varnadore's supervisor at Papa John's, at 10:38 p.m., Appellant's

---

[2] Because this case turns on a cumulative error analysis, we set forth the evidence as reasonable jurors would have viewed it, rather than in the light most favorable to the jury's verdicts.

prepaid Tracfone, rather than his cell phone that was linked to Porter's account, was used to call the Papa John's restaurant and order two regular pizzas, two dessert pizzas, pepperoncinis, garlic sauce, and soft drinks for delivery.[3] The caller said that his name was "Josh" and asked for his order to be delivered to apartment 10108. Appellant's Tracfone was used to call Papa John's twice more while waiting for the order. The first time the caller asked whether the delivery driver could break a $100 bill, and the second time the caller asked for an update on the status of the order. Call records also showed that Varnadore called Appellant's Tracfone shortly before the shooting, and then shortly after that, the same Tracfone was used to call Young's cell phone.

Sometime after 11:15 p.m., Varnadore arrived at the apartment complex in his light green Toyota Prius to make the

---

[3] Harris testified that she was aware that Appellant had a Tracfone. Porter testified that while Appellant had a Tracfone, she thought that he was no longer using it by the night of the shooting because she had added him to her cell phone plan and gotten him another cell phone, and she had not communicated with him on his Tracfone since November 2015. There was no evidence that Young owned a Tracfone.

delivery. A man sitting in a car parked next to the 10000 building testified that he heard a gunshot and then saw a man stumble and fall into a nearby parking space. The police soon arrived and found Varnadore lying on the ground in a parking space, unresponsive and with a single gunshot wound to his upper left abdomen; police also found a spent .40-caliber Smith & Wesson shell casing several feet away. Varnadore had $62 in his pocket. He was taken to the hospital, where he was pronounced dead. Officers found a Papa John's plastic bag and an empty Papa John's thermal bag used to transport food in the breezeway near apartment 10108.

Call records for Appellant's Tracfone showed that it had been used several times before and after the shooting to call and receive calls from Young's cell phone.[4] Young's Facebook profile made several references to Malek Buckley and to Appellant's Facebook profile, which was titled "Rayray Da Shoota." Detectives later discovered that both Appellant and Buckley lived in apartment 9301

---

[4] Detectives used Facebook to determine that the Chicago-area phone number Appellant's Tracfone had called and received calls from was Young's cell phone number.

in an apartment building adjacent to the crime scene.

Around 1:00 p.m. the following day, the Gwinnett County SWAT team arrived to execute a search warrant at Porter's apartment. Appellant, Young, Buckley, Porter, and Harris were all present. After officers announced their presence but before the apartment's occupants exited the apartment, Porter saw Young carry a box of pancake mix into the bedroom that Appellant and Young shared, and Harris saw Appellant try to hide a pizza box under Harris' bed, but Harris retrieved the box and put it in the kitchen. Officers then located the following inside the apartment: (1) the Tracfone in the bedroom shared by Appellant and Buckley; (2) three Papa John's pizza boxes hidden behind a washing machine and another on a nightstand in a bedroom; (3) pieces of pizza wrapped in tin foil in the refrigerator and remnants in the kitchen garbage can; (4) pepperoncinis and garlic sauce cups inside a bathroom vanity; and (5) two boxes of pancake mix, one containing a .40-caliber Smith & Wesson semiautomatic handgun and the other with a handgun ammunition magazine inside.

Detectives took all of the occupants to the police station and interrogated each of them separately, interviewing Appellant last. Detectives advised Appellant of his *Miranda* rights,[5] and he agreed to speak with them without an attorney present. Appellant's story changed significantly over the course of his roughly two-hour interview. He initially denied any knowledge of the shooting but eventually stated that Young was the shooter. Appellant claimed that Young ordered the pizzas using Appellant's Tracfone and was planning to rob the pizza delivery driver. Appellant admitted that he was aware of Young's robbery plan but claimed that he eventually decided to wait on the second floor near a staircase when Varnadore arrived because — as he had informed Young — he did not want to participate in the robbery plan; that Young approached Varnadore, who told Young, "[Y]ou might as well shoot me because you already pulled the gun out on me"; and that shortly thereafter Appellant heard a gunshot and took off running. Appellant repeatedly denied

---

[5] See *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

that he shot Varnadore and indicated that he was willing to undergo testing for the presence of gunshot residue, which never occurred. However, he admitted that hours before the shooting, he uploaded to his Facebook page a picture of him holding the handgun that was used to shoot Varnadore. Appellant also admitted that even though he took off running after hearing the gunshot, he came back to the breezeway, collected the pizza boxes, and brought them to Porter's apartment. Detectives later arrested both Appellant and Young.

At trial, the State's theory was that Appellant and Young committed the crimes as parties but that the evidence strongly indicated that Young rather than Appellant was the shooter. A GBI firearms examiner testified that the bullet recovered from Varnadore's body was fired from the handgun found in a box of pancake mix in Porter's apartment. Porter testified that on the night in question, she was jolted awake by a gunshot and left her bedroom to find Young and Buckley seated on a couch in the living room. Porter said that she then walked outside, saw Appellant coming up the stairs with four pizza boxes in his arms, and asked him if he

heard the gunshot; Appellant replied that he did not because he had his earphones in. Harris also testified that after hearing a gunshot, she came into the living room, that both Young and Buckley were there, and that she saw Appellant calmly entering the apartment with four pizza boxes in hand.

Buckley testified that he was asleep when Young woke him up and stated that he had "hit a lick,"[6] that the pizza delivery guy flinched and the gun went off, and that Young thought that he shot the pizza delivery guy in the stomach or arm. Buckley further clarified that although both Young and Appellant were present when Young woke him up, Young stated that "he" (and not both he and Appellant) had "hit a lick."

Appellant did not testify at trial and did not call any witnesses. His defense theory was that although he was in the apartment with Young on the night of the shooting, it was Young who orchestrated and carried out the robbery; that to the extent that he was aware of

---

[6] Detective Matthew Kenck testified that, based on his training and experience, the phrase "hit a lick" means commit a robbery.

Young's scheme, his youth allowed Young to influence him; and that he withdrew from any involvement upon realizing Young's full intentions.

Appellant does not challenge the legal sufficiency of the evidence supporting his conviction. Nevertheless, we address this issue in accordance with this Court's usual practice in murder cases. Although there was no evidence presented at trial that Appellant directly committed any of the charged crimes, OCGA § 16-2-20 (a) provides that anyone "concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime," and § 16-2-20 (b) explains that a person is "concerned in the commission of a crime" if he "intentionally aids or abets" the commission of the crime or "intentionally advises, encourages, hires, counsels, or procures" another person to commit the crime. We have also explained that

> [w]hile mere presence at the scene of a crime is not sufficient evidence to convict one of being a party to a crime, criminal intent may be inferred from presence, companionship, and conduct before, during and after the offense.

(Citations and punctuation omitted.) *McGruder v. State*, 303 Ga. 588, 591 (II) (814 SE2d 293) (2018). Finally, a shooting is a reasonably foreseeable consequence of an armed robbery and thus a party to an armed robbery is culpable for felony murder if a fatal shooting occurs. See *Frazier v. State*, 308 Ga. 450, 453 (2) (a) (841 SE2d 692) (2020).

Here, the State presented strong evidence of Appellant's guilt as a party to the charged crimes, and the jury was charged on parties to a crime. See *Frazier*, 308 Ga. at 453 (2) (a). The State presented a photograph Appellant uploaded to his Facebook page hours before the shooting, which, as he admitted during his interview, depicted him holding the handgun that was used in the murder. Call records from Appellant's Tracfone showed that a short time after Appellant offered to order pizza, someone used his Tracfone to order the pizzas that Varnadore attempted to deliver. Testimony from Varnedoore's supervisor showed that when the pizzas were ordered, someone using Appellant's Tracfone gave a fictitious name and provided the

address to an apartment located in the building next to Appellant's.[7] Call records and witness testimony showed that someone using Appellant's Tracfone subsequently called the Papa John's restaurant twice — once to see when his order would arrive, and a second time to ask if the delivery driver would have enough cash to give change for a $100 bill. Porter and Harris testified that shortly after a gunshot was heard, Appellant walked into the apartment calmly carrying Papa John's pizza boxes; Young was already there. Harris testified that when the SWAT team arrived to execute a search warrant, Appellant attempted to hide evidence (a pizza box) under someone else's bed. An investigator testified that the murder weapon that Appellant was holding in the photograph posted to Facebook hours before the shooting was found in the apartment the next day. Investigators also testified that they found Papa John's

---

[7] Appellant claimed in his interview that Young used Appellant's Tracfone to orchestrate and carry out the charged crimes, but that claim is undermined by evidence that the Tracfone had been used to call and receive calls from Young's cell phone prior to the shooting and that shortly after Varnadore called the Tracfone, whoever was using the Tracfone called Young's phone.

pizza boxes and other items that were ordered in the apartment, and, importantly, that Appellant's Tracfone was found in the bedroom that Appellant and Buckley shared. Finally, Appellant initially lied to the police and claimed no knowledge of the shooting but ultimately admitted that he knew there was a plan to rob Varnadore, that he knew a gun was involved, that he was close enough to Young and Varnadore to hear their discussion, and that although he took off running after he heard a gunshot, he returned to take the pizza boxes and other items from Varnadore.

When viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient as a matter of constitutional due process to authorize a rational jury to find Appellant guilty beyond a reasonable doubt as a party to the felony murder of Varnadore predicated on armed robbery. See *Jackson v. Virginia,* 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also OCGA § 16-2-20.

2. Relying on our decision in *Ledford v. State*, 264 Ga. 60 (439 SE2d 917) (1994), which was decided under Georgia's former

Evidence Code, Appellant contends that the trial court erred in denying his pretrial motion to prevent the State from calling Varnadore's mother at trial to identify her son in an in-life photograph. Appellant argues that allowing the mother to identify the photograph inappropriately injected emotion into his trial and was unnecessary because other witnesses could have testified to the same information. He asserts that the trial court's error harmed him because, but for an emotional outburst by Varnadore's mother, the jury would have been able to focus on the properly admitted evidence.

(a) The State called Varnadore's mother as its first witness at trial. She began to cry as soon as she took the stand and was asked her name. Appellant then moved for a mistrial, and the jury was excused. Appellant argued that it was inappropriate for the jury to see her emotional displays, especially given that other State witnesses, including Varnadore's boss, could identify an in-life photograph of Varnadore. After questioning Varnadore's mother and receiving her assurance that she had composed herself, the trial

court denied Appellant's motion, the jury returned, and the mother testified.[8] During her brief testimony, the mother identified an in-life photograph of her son. She also identified her son's cell phone number as one of the telephone numbers on her family plan, and stated that he drove a light green Toyota Prius, which she co-owned. The record does not indicate that she had any further emotional outbursts, and Appellant did not cross-examine her.

(b) Because Appellant's trial took place in 2016, the former Evidence Code relied upon by this Court in *Ledford* did not apply. Instead, we look to Georgia's current Evidence Code to assess Appellant's claim of error.

> Pursuant to OCGA § 24-4-402, "[a]ll relevant evidence shall be admissible[.]" To evaluate relevancy, this Court relies on OCGA § 24-4-401, which defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

---

[8] Appellant does not enumerate as error the denial of his motion for mistrial. "Further, a trial court has broad discretion in deciding whether to grant a mistrial, and the grant of a mistrial is required only if it is apparent that a mistrial is essential to the preservation of the right to a fair trial." (Citations and punctuation omitted.) *Ragan v. State*, 299 Ga. 828, 833-834 (3) (792 SE2d 342) (2016).

However, relevant evidence may be excluded under OCGA § 24-4-403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The major function of Rule 403 is to exclude matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect.

(Citations and punctuation omitted.) *Ragan v. State*, 299 Ga. 828, 832 (3) (792 SE2d 342) (2016). "Moreover, the exclusion of relevant evidence under Rule 403 is an extraordinary remedy that should be used only sparingly." (Citation and punctuation omitted.) *Pike v. State*, 302 Ga. 795, 799 (3) (809 SE2d 756) (2018).

In *Ragan*, the trial court admitted into evidence five photographs of a murder victim, some showing her with her children, through the testimony of her husband, who had also been shot while standing next to his wife. We noted this Court's holdings under the former Evidence Code that a photograph of a victim in life may be relevant to prove an element of the corpus delicti, but also emphasized that care must be taken to balance the "tenuous probative value of a victim-while-in-life photograph" against "the

substantial prejudicial impact." *Ragan*, 299 Ga. at 832 (3). In this regard, we noted our previous suggestions under the former Evidence Code "that every effort should be made to proffer a photograph of the victim alone," *Boyd v. State*, 284 Ga. 46, 48 (2) (663 SE2d 218) (2008), and that "the better practice is to not permit a victim's family member to identify the victim where other nonrelated witnesses are able to do so." (Citation and punctuation omitted.) *Flowers v. State*, 275 Ga. 592, 594 (4) (571 SE2d 381) (2002). Given the "cumulative prejudicial effect" of the five photographs at issue, and in light of their scant probative value, we concluded that the trial court abused its discretion in admitting the five photographs. See *Ragan*, 299 Ga. at 833 (3).

Here, in contrast, even though Varnadore's mother cried for a very short time after taking the stand, she identified only a single photograph, depicting the victim alone in front of a neutral background. Her identification was brief, consisting only of her statement that the picture was of her son and her affirmative response when asked, "Is that Shane Varnadore?" The record does

not reflect that she had any emotional reaction while she was identifying the photograph, and she testified about other relevant matters as well. Although the probative value of this photograph and the related testimony may have been limited, because the State introduced only a single, neutral photograph of Varnadore alone, and his mother's testimony regarding that photograph was brief and without any evidence of strong emotion, we cannot say that the trial court abused its discretion in concluding that the danger of unfair prejudice in this circumstance did not substantially outweigh the probative value. Accordingly, this enumeration of error fails.

3. Appellant argues that the trial court erred in allowing into evidence three photographs posted to his Facebook page in 2015 that showed him with handguns — two depicting him pointing handguns at the camera and the third depicting him with a handgun in his waistband — because those photographs amounted to improper and highly prejudicial character evidence. We conclude that any error in the admission of the photographs was harmless.

(a) Before trial, Appellant moved to preclude the State from

offering into evidence four photographs obtained from his Facebook page that depicted him holding handguns on the basis that they were inadmissible character evidence. After a hearing in which the State argued that the photographs were admissible under OCGA § 24-4-404 (b) ("Rule 404 (b)") to show that Appellant was comfortable and familiar with firearms, that Varnadore's death was not an accident, and to show intent, the trial court denied Appellant's motion without explanation. At trial, Appellant renewed his objection to three of the challenged photographs but conceded that the fourth photograph, which was uploaded to Facebook hours before the shooting and which he admitted in his interview showed him holding the murder weapon, was admissible intrinsic evidence. The State again argued that the challenged photographs were relevant to the issue of intent because they showed that Appellant was comfortable and familiar with firearms. The trial court noted its earlier ruling and overruled Appellant's objection.

(b) Pretermitting whether the trial court abused its discretion in admitting the three challenged photographs, we conclude that

any error in their admission was harmless. "The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." (Citation and punctuation omitted.) See *Kirby v. State*, 304 Ga. 472, 478 (3) (c) (819 SE2d 468) (2018). See also OCGA § 24-1-103 (a) ("Error shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected . . . ."). And in considering whether a trial court's error was harmful, "we weigh the evidence as we would expect reasonable jurors to have done so, as opposed to assuming that they took the most pro-guilt possible view of every bit of evidence in the case." *Boothe v. State*, 293 Ga. 285, 289 (2) (b) (745 SE2d 594) (2013). As we explained in *Boothe*,

> where error is committed in the trial of the case in the form of the admission of prejudicial evidence, . . . the evidence is examined to determine whether the legal evidence is so strong or overwhelming that it is highly probable the illegal evidence did not contribute to the verdict.

(Citations and punctuation omitted.) Id. at 289 (2) (b) n.8.

Here, even if the trial court erred in admitting the three

photographs posted to Facebook in 2015 under Rule 404 (b), this error was harmless because, as discussed above, the State presented strong independent evidence of Appellant's guilt as a party to the felony murder, and the jury was charged on parties to a crime. See *Davis v. State*, 307 Ga. 746, 751 (2) (b) (838 SE2d 263) (2020) (holding that improperly admitted testimony suggesting that the defendant was the shooter was harmless because the State presented strong independent evidence of the defendant's guilt as a party to the crime and the jury was charged on parties to a crime). Moreover, as Appellant acknowledges, the trial court properly admitted as intrinsic evidence a photograph that he posted to his Facebook account just hours before the shooting in which he was holding the handgun used to kill Varnadore. See *Smith v. State*, 307 Ga. 106, 115 (5) (834 SE2d 750) (2019). Because the jury properly learned that Appellant possessed the murder weapon, evidence that he possessed other guns at other times was less prejudicial. See *Hood v. State*, 299 Ga. 95, 106 (786 SE2d 648) (2016) (concluding that error in admitting evidence of defendant's prior drug-dealing

activities was harmless in part due to properly admitted testimony showing that on prior occasions defendant had dealt drugs similar to those for which he was charged with distributing).

In addition, any harm from the admission of the photographs was lessened because the State did not try to use the photographs to establish that Appellant rather than Young was the shooter. Further, the photographs were not a significant part of either party's closing arguments. See *Jackson v. State*, 306 Ga. 69, 80-81 (2) (c) (829 SE2d 142) (2019) (concluding that harm from the erroneous admission of defendant's prior bad act was minimal because, among other reasons, the record failed to show that the prosecutor emphasized that evidence in his closing argument).

Although Appellant claimed that Young was the shooter and he was just an innocent bystander, the properly admitted evidence discussed above strongly supported a finding that Appellant was guilty as a party to the felony murder based on armed robbery, as it shows that he was associated with Young in the planning, execution, and attempted cover-up of that crime. Thus, we conclude that any

error in the admission of the photographs posted to Facebook in 2015 did not contribute to the felony murder verdict and was therefore harmless. See *Kirby*, 304 Ga. at 478 (3) (c).

4. In a related enumeration of error, Appellant contends that because the three photographs posted to Facebook in 2015 were inadmissible character evidence, the trial court also erred in denying his request to redact portions of his video-recorded interview during which Detective Matthew Kenck confronted him with the Facebook photographs and stated that "these pictures make you look like a cold-blooded killer" and that "you can let these pictures talk for you."

As an initial matter, we agree with the State that we must review this claim only for plain error. Appellant objected during a pretrial hearing to the admission of Detective Kenck's video-recorded statements about the photographs, but the trial court did not rule on that objection at the hearing or in its written order on the parties' pretrial motions, and Appellant did not renew his objection at trial. Thus, Appellant failed to preserve this issue for

ordinary appellate review. See OCGA § 24-1-103 (a).[9] Therefore, to prevail on this enumeration of error, Appellant must show that: (1) there was an error that he did not affirmatively waive; (2) the error was obvious; (3) the error affected his substantial rights, which means that he must demonstrate that the error likely affected the outcome of the proceedings; and (4) the error seriously affected the fairness, integrity, or public reputation of judicial proceedings. See *State v. Kelly*, 290 Ga. 29, 33 (2) (a) (718 SE2d 232) (2011). See also OCGA § 24-1-103 (d).

---

[9] OCGA § 24-1-103 (a) says:

> Error shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected and:
>
> (1) In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context; or
>
> (2) In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by an offer of proof or was apparent from the context within which questions were asked.
>
> *Once the court makes a definitive ruling on the record admitting or excluding any evidence, either at or before trial*, a party need not renew an objection or offer of proof to preserve such claim of error for appeal.

(Emphasis supplied.)

Pretermitting whether the trial court committed obvious error by allowing the State to play the challenged portions of Appellant's video-recorded interview, he has failed to show that any such error likely affected the outcome of his trial. As noted above, the State offered strong independent evidence of Appellant's guilt as a party to the felony murder. Moreover, the jury would not have been surprised to hear that Detective Kenck suspected that Appellant was responsible for Varnadore's death given that Detective Kenck ultimately arrested Appellant for murder. See, e.g., *Davis*, 307 Ga. at 750 (2) (a) (concluding that a detective's testimony that her interviews led her to focus on the defendant as a potential suspect "was an obvious point given that she ultimately arrested him"); *Thompson v. State*, 304 Ga. 146, 153 (9) (816 SE2d 646) (2018) (concluding that a detective's testimony that she believed that the defendant was the shooter "would have come as no surprise to the jury" because she obtained a warrant for the defendant's arrest). Therefore, Appellant has not shown plain error in this respect.

5. Next, Appellant argues that the trial court erred in

precluding him from asking Detective Kenck about Young's actions while Young was awaiting his interview at the police station. Appellant contends that the trial court had no evidentiary basis upon which to exclude this evidence, and the exclusion harmed his defense theory that Young was solely responsible for Varnadore's death. We conclude that Appellant has failed to show reversible error in this respect.

Appellant questioned Detective Kenck on this subject outside the jury's presence. Detective Kenck testified that while Young was awaiting questioning: (1) he was moving around the interview room a lot; (2) he stood on a chair and tried to peer into the ceiling; and (3) he tried to listen through the door on multiple occasions including, at one point, by lying on the floor to listen through the crack under the door. Detective Kenck further stated that Young's shoes were extremely muddy. The trial court precluded Appellant from cross-examining Detective Kenck in front of the jury about Young's demeanor but allowed Appellant to elicit from Detective

Kenck that Young's shoes were very muddy.[10]

Pretermitting whether the trial court erred in this respect, we conclude that any such error was harmless. We will assume for the sake of argument that Detective Kenck's testimony outside the presence of the jury about Young's actions in the interview room tended to make it more likely that Young was involved in the crimes. However, because the State's evidence and argument indicated that Young was the shooter, this evidence suggesting Young's consciousness of guilt would have had little if any impact on the jury's verdict. Moreover, the State offered strong evidence of Appellant's guilt as a party to the felony murder, and the jury was charged on parties to a crime. The jury therefore did not need to decide whether Appellant or Young was the shooter in order to find Appellant guilty of felony murder. Thus, we conclude that it is highly probable that any error in precluding Appellant from cross-examining Detective Kenck about Young's demeanor in the

---

[10] As stated above, there was evidence that it was raining on the night of the shooting.

interview room did not contribute to the felony murder verdict.

6. Appellant also contends that he was denied the effective assistance of counsel. We disagree.

To prevail on his ineffective assistance of counsel claim, Appellant must demonstrate both that his counsel was professionally deficient in failing to make the objections and that there is a reasonable probability that the outcome would have been more favorable to him if they had been made. See *Strickland v. Washington*, 466 U. S. 668, 687 (III) (A), 694 (III) (B) (104 SCt 2052, 80 LE2d 674) (1984). "The combined effect of counsel's unprofessional errors must be considered in assessing whether the requisite prejudice has been shown." *Fisher v. State*, 299 Ga. 478, 483 (2) (788 SE2d 757) (2016).

To satisfy the deficiency prong, Appellant must show that his attorney performed at trial in an objectively unreasonable way considering all the circumstances and in light of prevailing professional norms. See *Romer v. State*, 293 Ga. 339, 344 (3) (745 SE2d 637) (2013). "[R]easonable decisions as to whether to raise a

specific objection are ordinarily matters of trial strategy and provide no ground for reversal." (Citation and punctuation omitted.) *Williams v. State*, 302 Ga. 474, 486 (IV) (d) (807 SE2d 350) (2017). And "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight." *Strickland*, 466 U. S. at 689 (III) (A).

(a) Appellant first argues that his trial counsel was professionally deficient for not objecting to the three photographs of Appellant with handguns that were posted to Facebook in 2015 on the ground that they showed his Facebook username, which was "Rayray da Shoota." Thus, the question is whether Appellant has shown that no competent attorney would have failed to object to the State's display of the three photographs on the basis that they included his Facebook username. See *Brown v. State*, 288 Ga. 902, 908 (5) (708 SE2d 294) (2011).

The three photographs were published to the jury immediately after they were admitted into evidence. During its closing arguments, the State again published two of the photographs and

made reference to Appellant's Facebook username on several occasions.[11] As noted above in Division 3 (a), trial counsel objected to the admission of the three photographs in a pretrial motion and again at trial on the basis that they were improper character evidence. However, counsel did not separately object to the inclusion in the photographs of Appellant's Facebook username.

At the hearing on Appellant's motion for new trial, trial counsel testified that she did not think about objecting to the inclusion of Appellant's Facebook username before or during the trial. She further testified that a few weeks after trial, she realized that she could have objected to the inclusion of Appellant's Facebook username because it was prejudicial and there was evidence that Appellant chose that username more than two years prior to the shooting, so the username was not "direct evidence" in the case.

---

[11] For example, the State argued, among other things, the following:
Ladies and gentlemen, I would like you to meet the real Reginald Lofton, not the one in the suit sitting over here, sending his attorney up here to tell you about big bad Jermaine Young. Meet the real Reggie Lofton, aka Rayray da Shoota. You know, a picture speaks a thousand words, but a name, it speaks 10,000.

Pretermitting whether counsel's failure to object to the admission of his Facebook username was objectively unreasonable, Appellant has failed to show prejudice. While trial counsel did not object to the name's admission, she in part reduced any prejudice by eliciting testimony at trial that Appellant was fond of basketball and arguing in closing that Appellant's username was based on his love for basketball and nothing else. Moreover, as stated above, any harm caused by the inclusion of the username was lessened because the State did not try to use the photographs to establish that Appellant rather than Young was the shooter. Finally, as discussed above, the State presented strong evidence of Appellant's guilt as a party to felony murder. In light of this strong evidence, Appellant has failed to show that had his username been redacted from the photographs before they were shown to the jury, there is a reasonable probability that the outcome of his trial would have been different. See *Strickland*, 466 U. S. at 694 (III) (B). Accordingly, Appellant has not shown ineffective assistance of counsel in this respect.

(b) Next, Appellant argues that his trial counsel was professionally deficient for not objecting to the State's use, during its closing arguments, of explicit appeals to the jury's sympathy for Varnadore and his mother. As explained below, we conclude that counsel was deficient in this respect. However, Appellant has not shown that but for this deficiency, alone or when considered in combination with the deficiency assumed in Division 6 (a), there is a reasonable probability that the outcome of his trial would have been different. See *Fisher*, 299 Ga. at 483 (2). Therefore, he has failed to show that he was denied the effective assistance of counsel.

(i) Appellant's counsel argued in closing that Young, who was 21 years old, easily overrode the will of Appellant, who was only 14 years old. Trial counsel also argued that the evidence showed that Young orchestrated and perpetrated the charged offenses and that Appellant withdrew from any involvement once he realized Young intended to rob Varnadore. Counsel emphasized that Appellant was raised in unfortunate circumstances amid the violence that plagues certain neighborhoods in Chicago.

In rebuttal, the prosecutor argued:

I want to show you the world's most valuable pizza, the most valuable pizza, because this pizza was worth more than 28 years of Shane Varnadore's life. It was worth more than the blood and the sweat and the tears of that hardworking man's life, a man on a managerial track, delivering pizzas, living with his widowed mother. This pizza meant more to Reginald Lofton than Shane Varnadore, and that's pretty pathetic.

I guarantee you that Teresa Varnadore, when she raised her baby boy, during his first birthday, when he couldn't – when she stayed up at night, when he wouldn't sleep through the night, when he was teething, when he learned to ride his bike, when he celebrated his 16th birthday, all that goes into being a mom, she never dreamt that she would be in this courtroom here. Thank you, Rayray da Shoota, because you brought her here.

. . .

Ladies and gentlemen, youth is a blessing, but it's not an excuse. He wants you to feel sorry for him. He wants you to feel sorry because his mom died and he grew up on the South Side of Chicago. You don't think Shane Varnadore, when his father died — his father's dead. How about some sympathy for Shane?

When Shane's path crossed Rayray da Shoota's, this is what happened to him. This is how Shane started, and this is how he ended up. There's only one link. [Appellant's] in there [i.e., the police station interview room] swearing to God. He's invoking the name of God. I guarantee you Teresa Varnadore was invoking the name of her God when those police officers showed up [to her home].

No evidence was presented at trial that Varnadore's mother was a widow, that Varnadore lived with her, that his mother stayed up at night when he was teething, that he was taught to ride a bike, or that his mother never dreamed on his first birthday or when he was celebrating his sixteenth birthday that she would be in a courtroom. There was also no evidence that Varnadore's father was dead, or that his mother was invoking the name of her God when officers showed up to her home to tell her that her son had been shot. While making these arguments, the State displayed  two of the Facebook photographs showing Appellant with firearms that included his Facebook username "Rayray da Shoota."[12]

(ii)   Under Georgia law, evidence about a crime victim's personal characteristics and the emotional impact of the crime on the victim, the victim's family, and the victim's community generally is not admissible in the guilt/innocence phase of a criminal trial.

---

[12] Although the record does not show which particular photographs the State displayed during its closing arguments, Appellant's trial counsel testified at the motion for new trial hearing that she believed that both of them were uploaded to Facebook in 2015.

See *Lucas v. State*, 274 Ga. 640, 643 (2) (b) (555 SE2d 440) (2001) (holding that "the trial court erred by allowing improper reference to victim impact in the State's opening statement and in the testimony of the first two witnesses"). See also OCGA § 17-10-1.2.[13] As we explained in *Walker v. State*, 282 Ga. 774, 777 (5) (653 SE2d 439) (2007), disapproved on other grounds by *Ledford v. State*, 289 Ga. 70, 85 (14) (709 SE2d 239) (2011), "background information about the victim that is not relevant to the issues in the guilt/innocence phase, particularly the sort of background information likely to engender the jury's sympathies, should not be presented to the jury during that phase." Id. at 777 (5).

In *Lucas*, a death penalty case, the State offered during the

---

[13] OCGA § 17-10-1.2 (a) (3) says:
> In all cases other than those in which the death penalty may be imposed, prior to fixing of the sentence as provided for in Code Section 17-10-1 or the imposing of life imprisonment as mandated by law, and before rendering the appropriate sentence, including any order of restitution, the court shall allow the victim, as such term is defined in Code Section 17-17-3, the family of the victim, or such other witness having personal knowledge of the crime to testify about the impact of the crime on the victim, the family of the victim, or the community.

guilt/innocence phase information that one victim was an "A-B student" and had "made the All-Star team every year," and that a second victim had been voted "most likely to succeed" by his classmates. (Punctuation omitted.) 274 Ga. at 642 (2) (a). We concluded that this information was irrelevant to the question of the defendant's guilt or innocence and held that its admission violated the proscription against the admission of victim impact evidence before the sentencing phase of a trial. See id. at 643 (2) (b). However, we held that the error was harmless beyond a reasonable doubt in light of the strong evidence presented of the defendant's guilt. See id. at 643-644 (2) (c).

More recently, in *Walker*, also a death penalty case, the trial court permitted the victim's wife to testify in "the guilt/innocence phase about the victim's church membership and his being a deacon." 282 Ga. at 777 (5). We concluded that the trial court violated the prohibition on the admission of victim impact information during the guilt/innocence phase of a trial. See id. However, as in *Lucas*, we held that the error was harmless beyond

a reasonable doubt. See id. Thus, *Lucas* and *Walker* make clear that victim impact information that is not relevant to the issues in the guilt/innocence phase of a criminal trial should not be admitted in that phase. Cf. *Keita v. State*, 285 Ga. 767, 771 (3) (684 SE2d 233) (2009) (holding that admission of victim's funeral pamphlet, which included a picture of the victim and indicated that he received a Christian burial, did not violate proscription against victim impact information in the guilt/innocence phase because it was not likely to engender the jury's sympathies).

Consistent with these decisions, we conclude that the State's explicit appeals to sympathy for Varnadore and his mother violated the proscription against presenting victim impact information during the guilt/innocence phase of Appellant's trial. See *Lucas*, 274 Ga. at 643 (2) (b). Simply put, information concerning Varnadore's career progression and the fact that his father had passed away prior to his death was irrelevant to the jury's determination of Appellant's guilt or innocence and inappropriately appealed to the jury's sympathies. The same is true of information concerning the

devastation Varnadore's mother felt and the fact that his death meant that she had lost both her son and her husband.

Finally, we reject the State's contention that the prosecutor's appeals to sympathy were permissible as invited responses to Appellant's closing argument. As we stated in *State v. Jackson*, 306 Ga. 626 (831 SE2d 798) (2019), our cases in this context

> do not hold that it is *proper* for a prosecutor to reference matters not in evidence simply because the reference is responsive to a defense argument. Rather, we have said that such prosecutorial comments ordinarily are not *prejudicial* if, taken in context, they were "invited" by defense counsel's opening salvo and *did no more than* respond substantially in order to right the scale.

(Citations, punctuation and footnote omitted; emphasis in original.) Id. at 630 (1). Here, the State's responses did considerably more than "right the scale." Id. Rather than attempting to mitigate the implications of Appellant's arguments concerning his young age and having been raised under unfortunate circumstances, the State — relying mostly on information not in evidence — opted to explicitly invite the jury to feel sympathy for Varnadore and his mother. We cannot conclude that such a response was merely "righting the

scale." Accordingly, we hold that the State's explicit appeals to sympathy were improper.

(iii)  We next consider whether Appellant has carried his burden of demonstrating that counsel was professionally deficient for not objecting to the State's improper victim impact arguments. The answer to that question turns on whether Appellant has shown that no competent attorney would have failed to object to these arguments. See *Brown*, 288 Ga. at 908 (5). We conclude that Appellant has made that showing because a competent defense attorney trying a murder case would have been aware of the cases in which we held that the State inappropriately presented victim impact information in the guilt/innocence phase. See, e.g., *Walker*, 282 Ga. at 777 (5); *Lucas*, 274 Ga. at 643 (2) (b).

To be sure, we have in many cases rejected ineffectiveness claims where the record indicated that the attorneys' decisions not to object to improper evidence or arguments were based on reasonable strategic considerations, such as the attorneys' desire to avoid highlighting the objectionable information. See, e.g., *Holmes*

*v. State*, 273 Ga. 644, 648 (5) (c) (543 SE2d 688) (2001) (noting that in some cases, "an objection may simply have highlighted the point being made by the prosecution" (citation and punctuation omitted)). Here, however, Appellant has shown that his counsel's failure to object was objectively unreasonable. There was no evidentiary value to the State's improper arguments, which were based largely on information not in evidence, and the impact of Varnadore's death on his family was both inflammatory and irrelevant to the jury's determination of Appellant's guilt or innocence of the charged crimes. We can conceive of no good reason why a competent attorney would purposefully forgo objecting to such improper arguments, and the record in this case reveals none.

Given that the State advanced these arguments in its rebuttal to Appellant's closing argument, the State's explicit appeals to sympathy for Varnadore were among the last words the jury heard from either party. And even if counsel chose not to object to these arguments to avoid interrupting the State in front of the jury, that was not a reasonable strategy because counsel had no further

opportunity to mitigate the potential prejudicial effect of the State's arguments. We therefore hold that counsel was professionally deficient for not objecting to the State's improper closing arguments.

(iv)  In order to prevail on this claim of ineffective assistance of counsel, Appellant must show that counsel's deficiency prejudiced him, which requires him to demonstrate that but for counsel's deficiency, there is a reasonable probability that the outcome of his trial would have been different. See *Strickland*, 466 U. S. at 694 (III) (B). He has not carried this burden. First, the trial court instructed the jury that it was not permitted to be influenced by sympathy for either party and that arguments of counsel are not evidence, and generally we presume that juries follow the trial courts' instructions. See *Allen v. State*, 277 Ga. 502, 504 (3) (c) (591 SE2d 784) (2004). Second, despite the State's improper appeals to sympathy, as noted above, the State presented strong evidence of Appellant's guilt as a party to the crime for which he was convicted, and the jury was charged on parties to a crime. Given the trial court's instructions and the strong evidence of Appellant's guilt  as a party to the

charged crimes, we cannot conclude that there is a reasonable probability that the outcome of his trial would have been different had his counsel objected to the State's improper arguments. Accordingly, Appellant has failed to show that he was denied the effective assistance of counsel.

7. Finally, we must consider whether the cumulative effect of counsel's actual or assumed deficiencies, along with any assumed evidentiary errors, resulted in harm to Appellant. See *State v. Lane*, 308 Ga. 10, 13 (1) (838 SE2d 808) (2020). See also *United States v. Benjamin*, 958 F3d 1124, 1137 (II) (F) (11th Cir. 2020) ("The cumulative error doctrine provides that an aggregation of non-reversible errors . . . can yield a denial of the constitutional right to a fair trial, which calls for reversal." (citations and punctuation omitted)).

The actual and assumed errors we must consider collectively in this case include: (1) the assumed errors in the trial court's admission of the three Facebook photographs of Appellant with handguns; (2) the assumed error in the trial court's refusal to redact

portions of Appellant's interview in which Detective Kenck confronted Appellant with photographs of Appellant with handguns; (3) the assumed error in the trial court's refusal to let Appellant cross-examine Detective Kenck about Young's demeanor while Young was in the interview room awaiting interview; and (4) trial counsel's assumed deficiency in not objecting to the admission of Appellant's Facebook username and actual deficiency in failing to object to the State's improper closing arguments.

Amassed against the potential harm resulting from those actual or assumed evidentiary errors and counsel's deficiencies was, as discussed at length above, a substantial amount of properly admitted evidence that strongly supported Appellant's guilt as a party to the felony murder. Moreover, the jury was charged on parties to a crime, that it was not permitted to be influenced by sympathy for or against either party, and that arguments of counsel are not evidence.

The combined prejudicial effect of the actual and assumed evidentiary errors and deficiencies by counsel is greater than any

single error would be, considered in isolation. Analysis of the cumulative prejudicial effect therefore makes this a much closer case. However, even when considered as a whole under the most demanding standard that applies to any of the alleged errors, the cumulative prejudicial effect of the actual and assumed evidentiary errors and counsel's deficiencies is not sufficient to outweigh the strength of the properly admitted evidence of Appellant's guilt as a party to felony murder based on armed robbery. Accordingly, we conclude that the combined prejudicial effect of the actual and assumed evidentiary errors and deficiencies by counsel did not deprive Appellant of his right to a fundamentally fair trial.

*Judgment affirmed. All the Justices concur.*

DECIDED JULY 1, 2020.
Murder. Gwinnett Superior Court. Before Judge Rich.
*Lynn M. Kleinrock*, for appellant.
*Daniel J. Porter, District Attorney, Lee F. Tittsworth, Samuel R. d'Entremont, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General*, for appellee.