**FIRST DIVISION**
**BARNES, P. J.,**
**GOBEIL and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**February 25, 2025**

# In the Court of Appeals of Georgia

A24A1245. IN THE INTEREST OF H. H., et al., CHILDREN.

BARNES, Presiding Judge.

The father of the minor children Ha. H. and Ho. H. appeals from a juvenile court order finding the children dependent as to the father and granting custody of the children to the Dekalb County Division of Family and Children Services ("the Department").[1] The father asserts that the trial court erred in failing to dismiss the dependency petition because it was unverified and because it failed to allege with specificity conduct by the father that resulted in the children's dependency. He further contends that the evidence failed to support a finding of dependency; that the

---

[1] As noted below, the children's mother is currently incarcerated, having been charged in the death of the children's older sibling. The mother is not a party to this appeal.

trial court erred in several evidentiary rulings, some of which resulted in a violation of the father's due process rights; and that the trial court erred in failing to conduct the dependency hearing within the statutorily prescribed time frame. For reasons explained more fully below, we find that the trial court erred in concluding that the dependency petition met the statutory requirement of verification. We further find, however, that this lack of verification did not require dismissal of the petition. Accordingly, we vacate that portion of the dependency order finding that the petition was verified and remand with direction that the Department be required to amend the petition by verifying the same. We affirm the remainder of the trial court's order, including its finding that the children are dependent as to the father.

On appeal from an adjudication of dependency, we review the evidence in the light most favorable to the juvenile court's judgment. See *In the Interest of A. M. B.*, 361 Ga. App. 551, 551 (864 SE2d 713) (2021). So viewed, the record shows that the parents were married in 2018 and remained married at the time of the dependency hearing. When the couple wed, the mother had a daughter from a previous relationship, A. J., born in or around 2016. A. J.-H. was reported to be autistic, had

cerebral palsy, and often had seizures. The mother gave birth to two daughters during the marriage, Ha. H. (born in May 2019) and Ho. H. (born in March 2021).[2]

On the evening of June 25, 2023, police received a report that the badly decomposed body of a dead child had been found in a closet at an apartment in DeKalb County. When police responded to the apartment in question, they found it in disarray, but fully furnished, and it looked as though the occupants had left hurriedly. The dead child was eventually identified as A. J.-H., and the case was referred to the Department. Upon investigating, the Department determined that the leaseholder/occupants of the apartment had been the mother, father, and three daughters. After locating Ha. H. in the custody of the father and locating Ho. H. in the custody of the mother, the Department filed dependency complaints and emergency requests for an ex parte order of protective custody as to both children. Based on the unexplained death of their sibling, the juvenile court entered removal orders as to each child and granted the Department custody of Ha. H. and Ho. H.[3]

---

[2] Although the father is the legal parent of both children, it appears he is not Ho. H.'s biological father. Nevertheless, the father has appealed the finding of dependency as to both children.

[3] The Department thereafter placed the children with a relative.

Following a preliminary protective hearing on July 20, 2023, the juvenile court entered an order continuing custody of the children with the Department, suspending the father's visitation until recommended by the children's therapist, and ordering the Department to file a dependency petition. The Department filed the required dependency petition as to both children on July 24, 2023 and it amended that petition on October 6.

Several weeks after the preliminary protective hearing, the father filed an emergency motion seeking visitation with the children and placement of the children with one of his parents. Although no written order appears in the record, the juvenile court apparently afforded the father some visitation because, on November 29, 2023, the DeKalb County Child Advocate filed a motion seeking an emergency hearing with respect to the father's court-ordered visitation. As grounds for the hearing, the motion alleged that after observing visits between the father and Ha. H., the child's therapist had contacted the Department and recommended the visits be stopped. The therapist informed the Department that on several occasions she had observed, Ha. H. flinch and cry when the father moved quickly towards her or exhibited frustration with the child's behavior. Additionally, following their visits, Ha. H. refused to talk about the

father, indicating to the therapist that the visits were traumatizing to the child. Following a hearing on December 5, 2023, at which the therapist testified,[4] , the juvenile court entered an order discontinuing the father's in-person visits with Ha. H. and requiring that all visits be supervised, take place virtually, and occur while the child was in either her therapist's office or the home of her maternal aunt.

The hearing on the dependency petition as to the father was held on December 11. At the outset of the hearing, the father objected to the Department's request that the trial court take judicial notice of the therapist's testimony at the December 5 visitation hearing. The father also objected to the dependency petition on the grounds that it was not verified. The trial court overruled both objections and denied the father's motion to dismiss the petition.

The Department presented the testimony of both the manager and assistant manager of the apartment complex where A. J.-H.'s body was discovered. The manager testified that the father was the sole lessee of the apartment in question. The original lease term expired on January 31, 2023 and, prior to that time, the father renewed the lease for an additional year. The evidence also showed that the father

---

[4] No transcript of the December 5 hearing appears in the appellate record.

made the rent payments for January, February, and March 2023. After no further rent payments were received, the apartment complex filed a dispossessory proceeding and obtained a writ of possession in May 2023. Although notice of both the filing of the dispossessory action and the issuance of the writ of possession were mailed to the residence and posted on the apartment door, neither the father nor the mother responded. Nor did either parent ever return their keys to the apartment.

On June 8, 2023, the father called the apartment office and asked to have his name removed from the lease. The manager explained that both the father and the mother would need to come into the office together and execute a "roommate release form," which would take the father off the lease and substitute the mother as the lessee. The following day, as the apartment office was closing, the father appeared with a document in another attempt to be removed from the lease. The document presented by the father, however, was not the required form, and the manager again explained that both he and the mother had to come to the office so that the mother could be substituted on the lease. The father then left the office area, parked in front of the building where his apartment was located, and walked towards that apartment.

Two days after A. J.'s body was found, the father called the assistant manager of the apartments and asked her to remove his name from the lease. The assistant manager recorded that call on her cell phone, and the recording was introduced into evidence and played for the court. During that conversation, the father insisted he had not executed the renewal lease and that he had made none of the rent payments the apartment received in 2023. The apartment records, however, showed that the online lease renewal was sent to the father's email address, which the apartment had used for all communications with the father. Those records further showed that the rent payments for January, February, and March 2023 were charged to the father's credit card.

The Department supervisor assigned to the case testified that after determining the leaseholder of the apartment, and in an effort to locate the parents of the deceased child, she contacted the father's stepmother. When asked, the stepmother refused to provide the supervisor with the father's phone number, but agreed to have the father contact the Department. Several hours later, the supervisor spoke with the father, who reported that Ha. H. was with him and had been in his care for the previous three months. The father also stated that he and the mother were separated and that he had

7

moved out of the apartment in June or July 2022. He acknowledged, however, that he had continued to pay rent even after leaving the apartment and that he paid the mother biweekly child support of $160. The father was continuing to pay child support even though he had physical custody of Ha. H. and even though he was not the biological father of the other children. According to the father, he had not seen either A. J. or Ho. H. "in over a year" — or since the time he had reportedly moved out of the apartment. The father also reported that he had last seen the mother approximately two-and-a-half months earlier and that he had last paid her child support approximately one week earlier. Despite having had recent contact with the mother, however, the father claimed he had no contact information for her.

The Department investigator assigned to the case interviewed both parents. During his interview, the father again stated that he and the mother had separated and he had not lived in the apartment since June 2022. He further stated that he had given the mother money for rent in January 2023, and that he took physical custody of Ha. H. "sometime after Easter" that year. The father also acknowledged that there had been some incidents of domestic violence between the mother and him. During her interview with the investigator, the mother stated that there was "a lot" of domestic

8

violence between the parties, including incidents of physical and emotional abuse. The mother also reported that the children were present at "a few incidents" of domestic violence.[5]

Over the father's objection, the court allowed the investigator to testify about her conversation with the mother concerning the father's treatment of A. J.-H. The investigator stated that, according to the mother, the father had kicked and bitten A. J. and he often strapped the child in a stroller to restrain her. On multiple occasions, the father told the mother that because of the child's special needs, A. J. should be surrendered for adoption.

The DeKalb County detective in charge of investigating A. J.'s death testified that because the child's body was so badly decomposed when it was discovered, the coroner had not yet been able to determine a cause of death. When questioned, however, the mother implicated herself in the child's death by admitting that she was the person "who left the child that day in the [apartment closet.]" The mother's statement did not implicate the father, but the case remained open with the district

---

[5] The record shows that between July 2019 and May 2020, police responded to three separate incidents of domestic violence between the parents.

attorney's office. Thus, the detective did not view the case as closed, and stated that the father had not been ruled out as a participant in the child's death.

According to the amended dependency petition, shortly after Ha. H. was taken into the Department's custody, she told a Department employee that "her daddy put her sister in the closet." As a result of this statement, the Department referred the child for a forensic interview. The forensic interviewer testified at trial and was qualified as an expert in the forensic interviewing of children. Over the father's objection, the juvenile court allowed the Department to introduce into evidence the forensic interviewer's written summaries of her conversations with Ha. H., and the interviewer used these during her testimony.[6]

The interviewer testified that during her first meeting with Ha. H., the child made unprompted statements about "being afraid of a skeleton in the dark." When the interviewer asked follow-up questions, the child refused to answer. During the second forensic interview, Ha. H. made several unprompted statements, including that the father had scratched her hand. The child also stated that the father would kill

---

[6] As discussed more fully below, the father argued that because the interview was video recorded, the recordings would be the best evidence of what transpired during the interview.

her, and demonstrated by placing her hands on her neck. Finally, the child reported that she was scared of the father. Again, however, when the interviewer asked follow-up questions regarding each of the child's statements, the child refused to respond. Based on Ha. H.'s unprompted statements, the interviewer did not feel that it would be safe to return the children to the father's custody.

When called as a witness by the Department, the father refused to answer any questions, and instead asserted his Fifth Amendment right against self-incrimination. The father, however, called his stepmother to testify on his behalf. According to the stepmother, the children's parents separated in June 2022, with the father moving out of the apartment and the mother and children remaining behind. She further testified that the father took custody of Ha. H. in April 2023, but before that time, the father saw all three girls "all the time[,] when he would go visit" them at the apartment.

Following the December 11, 2023 hearing, the juvenile court entered an order granting the Department's petition and finding the children dependent as to the father. Relying on the evidence presented at the December 5 and December 11 hearings, the court concluded that the parents "were the two people with the opportunity to harm [A. J.],"and that even after he allegedly moved out of the

apartment, the father continued to visit, meaning that he "clearly had access to [A. J.-H.] and the apartment where [her body] was found." Additionally, the court noted Ha. H.'s statements regarding her father's conduct and the fact that the child appeared to be afraid of him. The court also found that the district attorney's investigation with respect to A. L.-J.'s death remained open as to the father. Relying on these findings, the court concluded that the children were dependent as to the father. The father now appeals from that order.

1. The father contends that the trial court erred in denying his motion to dismiss the dependency petition for two reasons.

(a) First, the father argues that the petition was invalid because it was not verified, as required by the relevant statute. That statute, OCGA § 15-11-152, provides, in relevant part, that "[a] petition alleging dependency shall be verified and may rely on information and belief . . . ." Additionally, OCGA § 15-11-150 provides, in relevant part, that a petition for dependency "shall not be accepted for filing unless the court or a person authorized by the court has determined and endorsed on the petition that the filing of the petition is in the best interests of the public and [the] child."

Here, the dependency petition contained the signature of the court designee, certifying that the filing of the petition was in the best interests of the children and the public. Relying on this fact, as well as the fact that the petition was signed by counsel for the Department, the juvenile court found that the verification requirement had been satisfied. We find that the juvenile court's conclusion on this issue constitutes legal error.

As noted above, the relevant statute provides that "[a] petition alleging dependency *shall* be verified[.]" (Emphasis supplied.) OCGA § 15-11-152. As used in a statute, the term "shall" is recognized as a command, meaning that a requirement preceded by that word is mandatory. See *City of Milton v. Chang*, 373 Ga. App. 667, 679 (3) (a) (906 SE2d 784) (2024) (when interpreting a statute, "[t]he general rule is that 'shall' is recognized as a command, and is mandatory") (citation and punctuation omitted); *In the Interest of I. P.*, 371 Ga. App. 790, 793 (1) (903 SE2d 184) (2024) (holding that the use of the term "shall" in the juvenile code "denotes mandatory conduct"). And when applying a statute, this Court cannot construe it to "add to, take from, or vary the meaning of unambiguous words" contained therein. (Citation and punctuation omitted.) *In the Interest of I. P.*, 371 Ga. App. at 793 (1).

The Civil Practice Act makes clear that to satisfy the verification requirement, an employee representing the Department had to swear "before any notary public, magistrate, judge of any court, or any other officer of the state or county where the oath is made who is authorized by the laws thereof to administer oaths" that the facts set forth in the dependency petition were, upon information and belief, true and correct. OCGA § 9-10-113. See also *In the Interest of I. P.*, 371 Ga. App. at 793 (1) (in the absence of a conflicting provision within the Juvenile Code, the Civil Practice Act applies to juvenile proceedings). Thus, the trial court erred in finding that the Department's compliance with the requirements of OCGA § 15-11-150 satisfied the verification requirement of OCGA § 15-11-152. In so holding, the juvenile court ignored the rule that in construing a statute, a court must "seek to avoid a construction that makes some language mere surplusage." (Citation and punctuation omitted.) *In the Interest of I. P.*, 371 Ga. App. at 793 (1). See also *Hendry v. Hendry*, 292 Ga. 1, 3 (1) (734 SE2d 46) (2012) ("When we consider the meaning of a statutory provision, we do not read it in isolation, but rather, we read it in the context of the other statutory provisions of which it is a part.") Put another way, if the filing requirements of OCGA § 15-11-150 suffice to satisfy the verification requirement of

14

OCGA § 15-11-152, then the verification language of that subsection would be superfluous.

Although we find that the Department failed to verify the dependency petition, we further find that the trial court did not err in refusing to dismiss that petition. As a general rule, "the failure to verify a pleading is an amendable defect." *Janet Ricker Builder v. Gardner*, 244 Ga. App. 753, 755 (1) (536 SE2d 777) (2000). Additionally, the Juvenile Code provides, in relevant part, that a "petition alleging dependency" may be amended "*at any time* . . . [t]o cure defects of form[.]" (Emphasis supplied.) OCGA § 15-11-153 (a) (1). At this point in the dependency proceedings, the case remains pending in the juvenile court and will remain so until a final disposition — i.e., until the juvenile court orders reunification of the children with the father, see OCGA §§ 15-11-200 to 15-11-204; terminates the father's paternal rights, see OCGA § 15-11-233; or enters a final order placing permanent custody of the children with a third party. See OCGA § 15-11-210; § 15-11-212; § 15-11-230; §15-11-240. Given the pendency of the case in the court below, and because the relevant statute allows amendment of the dependency petition at any time, we remand the case with direction that the Department be required to amend the petition by verifying the same.

(b) Georgia law requires that a dependency petition "shall set forth plainly and with particularity . . . [t]he facts which bring a child within the jurisdiction of the court[.]" OCGA § 15-11-152 (1). This language, together with the principles of procedural due process, require a dependency petition to set forth the facts supporting the child's alleged dependency so that parents have sufficient information to allow them to prepare a defense. See *In the Interest of D. R. C.*, 191 Ga. App. 278, 279 (1) (381 SE2d 426) (1989). Relying on this law, the father asserts that the petition was defective because it failed to allege with specificity any conduct by him that resulted in the children's alleged dependency. We disagree.

The dependency petition alleged that the children's sibling had been found dead in an apartment leased to the father; that at the time of that discovery, the apartment was fully furnished but apparently abandoned, as if the occupants had left hurriedly; that shortly before the child's body was discovered, the father attempted to have his name removed from the apartment lease; that the mother had been charged criminally in connection with the child's death and that the father remained under investigation; that Ha. H. told her department supervisor that the father put her sister in the closet; that during a forensic interview, Ha. H. stated that her father had

16

scratched her and would kill her, and that she was scared of her father; and that there was a history of domestic violence in the home. At the dependency hearing, the Department introduced evidence as to all of the facts set forth in the petition, as amended. Accordingly, the pleadings provided the father with sufficient notice of the bases for the children's alleged dependency.

2. As the petitioner, the Department bore the burden of proving the children's dependency "by clear and convincing evidence." OCGA § 15-11-180. On appeal, the father contends that the Department failed to meet this burden. .This argument ignores the evidence of record, construed in favor of the judgment.

In examining whether a finding of dependency is supported by sufficient evidence, we review the record "in the light most favorable to the lower court's judgment to determine whether any rational fact finder could have found by clear and convincing evidence that the child is dependent." (Citation and punctuation omitted.) *In the Interest of A. M. B.*, 361 Ga. App. at 551. "[C]lear and convincing evidence is an intermediate standard of proof which is greater than the preponderance of the evidence standard ordinarily employed in civil proceedings, but less than the reasonable doubt standard applicable in criminal proceedings." (Citation and

17

punctuation omitted.) *In the Interest of K. M.*, 344 Ga. App. 838, 847 (2) (811 SE2d 505) (2018). "Although clear and convincing evidence represents a heightened standard of proof it did not require the [Department] to come forward with unequivocal or undisputed evidence" that placing the children with the father would result in their continued dependency. (Citation and punctuation omitted.) *Hayle v. Ingram*, 363 Ga. App. 657, 663 (2) (872 SE2d 310) (2022).

The Georgia Code defines a "dependent child," in relevant part, as a child who "[h]as been abused or neglected and is in need of the protection of the court[.]" OCGA § 15-11-2 (22) (A). This definition "focuses upon the needs of the child regardless of parental fault. The dependency petition is brought on behalf of the child and it is the child's welfare and not who is responsible for the conditions which amount to dependency that is the issue." (Citation and punctuation omitted.) *In the Interest of A. M. B.*, 361 Ga. App. at 555 (a). As relevant here, "neglect," is defined as including "[t]he failure to provide proper parental care or control, subsistence, education as required by law, or other care or control necessary for a child's physical, mental, or emotional health or morals[.]" OCGA § 15-11-2 (48) (A). And "in

determining whether a child is without proper parental care and control," the Code requires a court to consider, inter alia,

> Egregious conduct or evidence of past egregious conduct of a physically, emotionally, or sexually cruel or abusive nature by such parent toward his or her child or toward another child of such parent; . . . [the] [p]hysical, mental, or emotional neglect of his or her child or evidence of past physical, mental, or emotional neglect by the parent of such child or another child of such parent; and . . . [the] [s]erious bodily injury or death of a sibling of his or her child under circumstances which constitute substantial evidence that such injury or death resulted from parental neglect or abuse.

OCGA § 15-11-311 (a) (4)-(6). In evaluating whether a child would be dependent if returned to the parent's care and control as of the date of the hearing, "the juvenile court may consider evidence of past misconduct because the . . . court is not required to reunite a child with the parent in order to obtain current evidence of dependency[.]" (Citation and punctuation omitted.) *In the Interest of T. Y.*, 357 Ga. App. 189, 196 (1) (850 SE2d 244) (2020). See also *In the Interest of M. S.*, 352 Ga. App. 249, 258 (834 SE2d 343) (2019).

The evidence set forth above shows that the children's older sibling was found dead in an abandoned apartment leased to the father. Moreover, during the relevant

time frame, the father had access to the apartment and all three children. Sometime after the child's death the father attempted to have his name removed from the apartment lease and he made an additional effort to have his name removed following discovery of the child's body. The father remained under investigation with respect to A. J.'s death and at the dependency hearing, the father declined to answer any questions, instead asserting his Fifth Amendment right against self-incrimination. Ha. H. told the social worker that her father had placed her sister in the closet, and the child revealed during a forensic interview that the father had previously scratched her, claimed that the father would kill her, and stated that she was afraid of the father. Finally, the evidence showed that Ha. H.'s therapist had recommended against the child having in-person and/or unsupervised contact with Ha. H. Viewed in its entirety, this evidence was sufficient to demonstrate, clearly and convincingly, that Ha. H. and Ho. H. were dependent as to the father. See *In the Interest of S. C. S.*, 336 Ga. App. 236, 250 (4) (784 SE2d 83) (2016) (dependency finding supported by evidence that another child of the mother had suffered significant, unexplained injuries). See also *In the Interest of B. A.*, 367 Ga. App. 727, 729 (888 SE2d 292) (2023)

(dependency may be shown where the conditions that resulted in the child's removal from the home had not yet been remedied).

3. The father contends that the trial court committed reversible error with respect to four evidentiary rulings, each of which is discussed below.

(a) At the dependency hearing, the Department investigator testified with respect to a conversation she had with the mother. Over the father's objection, the juvenile court allowed the investigator to testify as to the mother's statements concerning the father's treatment of A. J., including the fact that the father kicked the child, restrained her in a stroller, and advocated that she be placed for adoption. On appeal, the father contends that this testimony was beyond the scope of the dependency petition. And because he lacked notice that the allegations concerning A. J. would be at issue, the introduction of this evidence violated his right to due process. This argument is not supported by the record.

The allegations contained in each of the pleadings filed by the Department made clear that the unexplained death of A. J. and the father's potential involvement in that death were considered the primary cause of the children's dependency. Moreover, the dependency petition, as amended, made clear that the Department also

had concerns about the father's potentially abusive conduct towards his children. Given these circumstances, the testimony concerning the father's treatment of A. J. did not exceed the scope of the dependency petition — i.e., the father had notice that the Department would present evidence on this issue. See *In the Interest of K. C. W.*, 297 Ga. App. 714, 717 (1) (678 SE2d 343) (2009) (where prior proceedings in the case made clear that the father's mental capacity was an issue, the father could not claim "unfair surprise" when evidence on that issue was introduced at the termination of parental rights hearing).

(b) During her cross-examination of the Department investigator, the father's attorney asked if the mother had admitted to killing A. J. The Department objected to the question, and the juvenile court sustained the objection, noting that the mother was a party to the dependency proceedings but was not present or represented at the hearing and therefore could not assert her Fifth Amendment right against self-incrimination on her own behalf. In his brief, the father summarily asserts that this ruling violated his right to due process. To support this assertion, the father appears to rely on the general rule that "[t]he minimum requirements of due process include the right to confront and cross-examine adverse witnesses[.]" (Citation and

22

punctuation omitted.) *Grimes v. State*, 364 Ga. App. 518, 520 (875 SE2d 500) (2022) (discussing the due process requirements applicable in probation revocation proceedings). In this case, however, the father was given an opportunity to confront and cross examine the witness in question. And the fact that the juvenile court limited the scope of the father's cross-examination does not, without more, constitute a due process violation. See *Brown v. State*, 288 Ga. 902, 906-907 (4) (708 SE2d 294) (2011) (trial court's decision to sustain the prosecution's hearsay objection to certain testimony that would arguably benefit the defense did not violate defendant's due process rights). See also *Johnson v. State*, 316 Ga. 672, 685 (5) (889 SE2d 914) (2023) (limiting the scope of cross-examination to relevant matters does not violate a defendant's right to confront witnesses against him).

(c) Georgia's Code of Evidence provides that "[t]o prove the contents of a writing, recording, or photograph, the original writing, recording, or photograph shall be required." OCGA § 24-10-1002. The father contends that the juvenile court violated this evidentiary rule when, over the father's objection, it: (i) allowed the assistant manager of the apartment complex to play the recording of her conversation with the father regarding removing his name from the lease directly from her cell

phone, rather than from the computer thumb drive onto which the recording was downloaded and then introduced into evidence; and (ii) when it allowed the forensic interviewer to testify concerning the statements made by Ha. H. during her forensic interviews rather than playing the video recordings of those interviews.

(i) With respect to the conversation between the assistant apartment manager and the father, it is undisputed that the original recording was played for the court. And the father does not contend that the recording contained on the thumb drive submitted into evidence had been altered from the original recording. Accordingly, we find no violation of OCGA § 24-10-1002.

(ii) Assuming arguendo that the forensic interviewer's testimony violated OCGA §24-10-1002, the father cannot demonstrate that he was harmed by the absence of the video recording, and thus cannot show reversible error.[7] See *In the Interest of B. H.-W.*, 332 Ga. App. 269, 271 (2) (772 SE2d 66) (2015) ("It is a

---

[7] It does not appear that the Department deliberately refrained from providing the video recording. Counsel for the Department stated that she did not have a copy of those recordings, because none was provided by the forensic interviewer. And the forensic interviewer explained that in cases such as this, where law enforcement had some involvement, her employer's policy was that copies of recorded interviews would be provided only to law enforcement.

fundamental principle that harm as well as error must be shown for reversal based on an evidentiary ruling.") (citation and punctuation omitted).

The forensic interviewer testified from her written reports of the two interviews, and these reports were authenticated and introduced into evidence. And the forensic interviewer did not testify as to any facts not recorded in her notes. Moreover, the forensic interviewer was subject to cross-examination, and Ha. H. was also available to be cross-examined about her conversations with the interviewer. Finally, the father has offered no argument as to how the admission of the forensic interviewer's testimony and accompanying reports, as opposed to the video recording of the interviews, prejudiced him. Accordingly, we find that the juvenile court's admission of this evidence provides no basis for reversal.

4. In his brief, the father enumerated as error the juvenile court's alleged failure to hold the dependency hearing within the statutorily-mandated time frame. . The father, however, offers no reasoned legal argument or citation to authority to support this claim. Accordingly, this enumeration of error is deemed abandoned. See Court of Appeals Rule 25(d)(1) ("[a]ny enumeration of error which is not supported in the brief by citation of authority or argument may be deemed abandoned); *Brown v. State*,

313 Ga. App. 714, 715 (722 SE2d 439) (2012) (claim of error deemed abandoned where "appellate brief wholly failed to support [the] enumerated error as required by our court rules").

For the reasons set forth above, we vacate that part of the juvenile court's order finding that the Department had verified the dependency petition and remand with direction that the petition be verified through amendment. We affirm the juvenile court's finding of dependency as to Ha. H. and Ho. H.

*Judgment affirmed in part, vacated in part, and remanded with direction. Gobeil and Pipkin, JJ., concur.*